## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| GATX CORPORATION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>GEORGIA POWER COMPANY,<br><br>　　　　　Defendant. | Civil Action File<br>No.: 1:19-cv-04790-AT |

## GATX'S  STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO GEORGIA POWER'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiff GATX Corporation respectfully submits the following Statement of Additional Facts in opposition to Defendant Georgia Power Company's Motion for Summary Judgment.

### GATX Statement No. 1:

The subject Cars were brand new when delivered to Georgia Power. (PX 1-A: Supplement No. 2 at ¶ 1. *See also* PX 12: Lewter Dep. at 112:11 – 112:14.)[1]

---

[1] In order to avoid duplicative filings, GATX's references to "PX #" refer to GATX's Exhibits filed in support of GATX's own motion for summary judgment. (*See* Dkt. #76-3 through #76-21, #84-1 through #84-7)

**GATX Statement No. 2:**

At the end of its lease, Georgia Power returned the Cars with extensive pitting damage. (PX 2 and PX 3: Inspection Reports; PX 6: Daum Report at 11 - 19.)[2]

**GATX Statement No. 3:**

The analysis of GATX's Engineering Department is that the pitting damage in the Cars jeopardizes the structural integrity of the Cars such that the Cars will have to be rebodied in order to safely realize their 50-year life. (PX 9: Dickman Decl. ¶ 4. PX 5: April 11, 2018 Buzas Email. PX 14: Buzas Dep. at 173:25 – 176:05; 206:15 – 207:10; 245:15 – 245:21; 298:22 – 299:09; 304:09 – 305:09.)

**GATX Statement No. 4:**

GATX's expert, Phil Daum, has concluded that it is an "absolute certainty" that the Cars will have to be rebodied in order to safely realize their full service life. (PX 8: Daum Dep. at 157:16 – 158:13; 161:02 – 161:14.)

---

[2] *See also* PX 7: Decl. of Phil Daum ¶¶ 5 – 7.

**GATX Statement No. 5:**

The first opinion listed in Paragraph 1 on Page 5 of Phil Daum's expert report says: "1. The lading Georgia Power transported in the subject cars caused the corrosion damage to the subject cars." (PX 6: ESi Report of Phil Daum at p. 5, ¶ 1.)

**GATX Statement No. 6:**

Section 2.5, titled "Net Leases," provides that "Lessee shall have no right to…be released, relieved or discharged from the obligation or liability to make all payments due thereunder for any reason whatsoever, including but not limited to the following: …any defect in, or damage to, or loss or destruction of, any Car from any cause." (PX 1: Master Lease § 2.5 (emphasis added). *See also* Ex. 12: Lewter Dep. 102:15 – 103:04 (regarding Section 2.5, "You asked does it mean what it says. I would say yes.").)

**GATX Statement No. 7:**

Section 9.1, titled, "Risk of Loss; Damages," and states: "Lessee shall bear all risk of, and shall be solely responsible for, any…damage of or to each Car, however caused," and further, that "Lessee shall bear all costs, charges and expenses related to each Car." (PX 1: Master Lease § 9.1 (emphasis added). *See also* Ex. 12: Lewter

Dep. at 111:09 – 13 ("Q. So what Section 9.1 says is that the less bears all risk of loss or damages to each car however caused unless otherwise expressly provided in the relevant lease; right? A. Yes.").)

**GATX Statement No. 8:**

With respect to Paragraph 5 of Supplement Nos. 2 and 3, Ms. Lewter testified at her deposition as follows:

Q.      All right. So that means that Georgia Power is representing that it was not placing a corrosive or placarded commodity in the car; right?

**A.      Yes.**

…

Q.      All right. So it is fair to say that Georgia Power understood that it could not put a corrosive commodity in the car; correct?

**A.      Georgia Power understands that it was allowed to put limestone or gypsum in the railcars.**

Q.      Okay. And it represented that such commodity was noncorrosive?

**A.      Yes.**

(PX 12: Lewter Dep. at 112:25 – 113:04; 113:24 – 114:08). *See also* PX 1-A & 1-B: Supplement Nos. 2 & 3 at ¶ 5)

4

**GATX Statement No. 9:**

GATX's claim is based on the pitting damage in the bottom of the Cars. (PX 9:

Dickman Decl. ¶ 4; PX 17: Kane Dep. at 109:10 – 109:17.)

**GATX Statement No. 10:**

At his deposition, Georgia Power's Rule 30(b)(6) witness on the condition of

the Cars, Michael Dunn, testified as follows:

> Q.      Has Georgia Power analyzed the structural integrity of the cars?
>
> **A.**      **No.**
>
> Q.      Has Georgia Power done an engineering analysis of what –
> what sorts or lengths of service the cars were suitable for at the
> time they were returned?
>
> **A.**      **No.**

(Dunn Dep. at 57:06 – 57:15.)

**GATX Statement No. 11:**

At his deposition, Georgia Power's inspector, Harry Mullins, testified:

> Q.      Prior to returning the cars, did – do you know whether Georgia
> Power did any kind of engineering analysis on the structural
> integrity of the cars?
>
> **A.**      **Not that I'm aware of.**

(Mullins Dep. at 81:10 – 81:18.)[3]

**GATX Statement No. 12:**

At his deposition, GATX's inspector, Larry Bank, testified:

> Q.       Is pitting on the body of a ten-year-old steel open-top hopper consistent with ordinary wear and tear?
>
> **A.       In my opinion, no. Pitting – pitting is not normal wear and tear, in my opinion. No.**

(Bank Dep. at 112:13 - 113:20.)[4]

**GATX Statement No. 13:**

At his deposition, Larry Bank testified:

> Q.       …do you have personal knowledge of the body of any steel open-top hopper where there was – there was pitting and the condition of the car was consistent with ordinary wear and tear?
>
> **A.       No, I can't think of a situation where a car would have pitting and that would be considered normal wear and tear.**

(Bank Dep. at 114:05 – 114:16.)

---

[3] Pursuant to this Court's standing order, Mr. Mullins complete transcript is filed at both Dkt. # 86 and Dkt. #103.

[4] Mr. Bank's complete deposition transcript is filed at Dkt. #92.

**GATX Statement No. 14:**

When properly serviced and maintained, the Cars are intended for a 50-year service life. (PX 6: Daum Report at 4 (citing NSC Specification P-392 and AAR Field Manual Rule 88.A.1). *See also* PX 9: Declaration of Tyler Dickman ¶ 3; PX 16: Viz Dep. at 336:20 – 338:09.)

**GATX Statement No. 15:**

At the end of Georgia Power's lease (from approximately 2007 – 2017), GATX's bargain with Georgia Power was that Georgia Power would return the Cars with 35 – 40 years of useful life remaining. (PX 1: Master Lease §§ 2.5, 3.1, 6.1, 8.2, 9.1. *See also* PX 9: Dickman Decl. ¶¶ 3 – 4; NY UCC § 2-A-532.)

**GATX Statement No. 16:**

Merriam-Webster Dictionary defines "corrosive" as "tending or having the power to corrode." (*See* https://www.merriam-webster.com/dictionary/corrosive.)

**GATX Statement No. 17:**

Dictionary.com similarly defines "corrosive" as "having the quality of corroding or eating away; erosive." (*See* https://www.dictionary.com/browse/corrosive.)

7

**GATX Statement No. 18:**

At his deposition, Georgia Power's expert, Mark Viz, testified:

> Q.     I'm asking if you can give me a plain and ordinary definition of "corrosive."
>
> **A.     And I think I've done that.**
>
> Q.     And that definition is something that is corrosive is that which leads to corrosion. Correct?
>
> **A.     A corrosive material is one that is somehow connected to or leads to or a somehow is – drives the mechanism of corrosion.**

(Viz Dep. at 159:03 – 18.)

**GATX Statement No. 19:**

In acknowledging Georgia Power's representation to GATX in Paragraph 5 of Supplement Nos. 2 & 3 that Georgia Power's gypsum and limestone was "noncorrosive," Ms. Lewter did not mention Title 49 of the Code of Federal Regulations. (PX 12: Lewter Dep. at 112:25 – 113:04; 113:24 – 114:08).)

**GATX Statement No. 20:**

Ms. Lewter did not mention Title 49 of the Code of Federal Regulations at *any* time during her deposition. (Lewter Dep, *passim*.)

8

**GATX Statement No. 21:**

At his deposition, Georgia Power's expert, William Kane, testified:

Q.      Okay. And so, in other words, the presence of the commodity in the bottom of the cars plays a role in the presence and extent of the pitting corrosion or the pitting damage or the localized corrosion that we see in the bottom of the cars; is that right?

**A.      Right.**

**Any time you have any material that's going to be stacked up against the surface like that, you're going to have a much different environment at that surface than if it was just open to the air like we would suspect with the very top of the – of the sheets there [sic] is exposed to.**

Q.      So, in other words, in the absence of the commodity, we would expect to see the more general rust or atmospheric corrosion that's visible at the top of the cars that we saw in figure 11 [of Exponent's own report]?

**A.      Probably, yes.**

…

Q.      And so you would agree with me that absent the commodity in this case, that you would not expect the same level or a similar level of pitting in the bottoms of the cars as we have here?

**A.      Yes. If the cars spent their lives not carrying anything, they would have different surface conditions.**

(Kane Dep. at 86:03 – 86:22; 190:21 – 191:03.)

9

**GATX Statement No. 22:**

On or about November 11, 2016, Georgia Power's Harry Mullins wrote to Christine Lewter: "The gypsum is very corrosive to the steel cars." (PX 19: 11/11/2016 Mullins Email.)[5]

**GATX Statement No. 23:**

At his deposition, GATX's expert, Phil Daum, testified:

> Q.    And do you have any opinion as to – do you have any opinion as to whether the definition applied in the hazmat regulations applies to the master lease agreement at issue in this case?

> **A.    Yes.**

> Q.    Okay. And what is that opinion?

> **A.    That they don't.**

> Q.    And why is that?

> **A.    Both gypsum and limestone are non-hazardous materials and, therefore, are not – that section does not apply.**

…

> Q.    I just want to make clear that it was your testimony that the terminology of non-corrosive non-placarded commodities under Title 49 of the Code of Federal Regulations on the one hand

---

[5] PX 19 was not attached to GATX's motion for summary judgment, and is therefore attached hereto.

and the transportation of limestone or gypsum at issue in this case on the other hand are two different things?

A.       **Yes.**

(Daum Dep. 182:01 – 14 (emphasis added); 261:09 – 19.)


**GATX Statement No. 24:**

Georgia Power's expert, William Kane, testified at his deposition:

Q.       Okay. But so that means that you don't know whether the Title 49 of the Code of Federal Regulations applies or governs open-top hoppers like those at issue in this case?

A.       **I know that <u>it would not apply</u> because those materials would not be considered hazardous.**

(Kane Dep. at 118:19 – 119:02 (emphasis added).)


**GATX Statement No. 25:**

At his deposition, Georgia Power's expert, Mark Viz, testified:

Q.       The definitions that Dr. Kane and you have relied on from Title 49, the Code of Federal Regulations, with respect to corrosion are not included in the Master Lease; right?

A.       **They are not, correct. They are not in the Master Lease.**

 (Viz Dep. at 280:03 – 09.)

**GATX Statement No. 26:**

Christine Lewter testified at her deposition:

> Q.       Okay. Am I correct that prior to this particular case any disputes between GATX and Georgia Power regarding corrosion in railcars were resolved through commercial resolution?

> **A.       That is correct. This is the third corrosion claim that we have received from GATX, and the prior two were resolved through commercial dealings.**

(Lewter Dep. at 35:13 – 21.)

**GATX Statement No. 27:**

Jay Leadingham testified at his deposition:

> Q.       Okay. And then Miss Campbell also asked you a series of questions about the – some of the prior disagreements or disputes between GATX and Georgia Power about whether Georgia Power was responsible for corrosion to those coal cars, correct?

> **A.       Correct.**

> Q.       She showed you a series of e-mails back and forth where you guys were trying to work out what I think you called a commercial resolution?

> **A.       Correct.**

> Q.       Did – Did I get your terminology right, commercial resolution?

> **A.       Yes.**

12

Q.      Okay. And commercial resolution is another word for settlement, isn't it?

**A.      Yeah. I mean, there's a – Yeah. There's a dispute and you resolve it.**

Q.      Yeah. And the e-mails back and forth were efforts at trying to reach a compromise between GATX and Georgia Power about the corrosion in those different cars that aren't at issue in this lawsuit?

**A.      Well, absolutely. Yeah.**

Q.      So, for example, when GATX or you would make a – send an e-mail in trying to work out the disagreement, you were making an offer of compromise to Georgia Power as a way to try to avoid litigation like we've, unfortunately, not been able to avoid in this case?

**A.      A hundred percent correct. As a sales commercial person, you want happy customers. You want to grow business. Getting in any type of litigation is the absolute last thing you want to do. You want to strengthen relationships, build relationships, grow business, not, you know not – not the opposite.**

(Leadingham Dep. at 248:01 – 249:17.)


**GATX Statement No. 28:**

Georgia Power's corporation representative, Christine Lewter, testified at her

deposition:

Q.      Okay. So Georgia Power had already signed the master lease

and Supplement 2 and 3 when you say Jay told you that this
master lease was silent on corrosion?

A.      **Yes.**

(Lewter Dep. at 145:15 – 19.)


**GATX Statement No. 29:**

Georgia Power's Chad Hewitt testified at his deposition:

Q.      When you had this correspondence with other people at
Georgia Power or Southern Company, did you ever have
discussions about changing any terms of the master lease when
you were having these lease extension negotiations?

A.      **You know, I don't recall wanting to change the terms of the
master lease.  And, you know, I would assume if we had or
wanted to change terms of a master lease, that that would
have been denoted and -- and the language would have been
papered up in the extension of lease two and three, or
supplement two and three.**

(Hewitt Dep. at 26:12 – 26:23.)


**GATX Statement No. 30:**

Christine Lewter testified at her deposition:

Q.      And then in the 2014 Amendment [the Master Lease] was
amended to specify that it was for gypsum or limestone
service?

A.      **That's correct.**

14

Q.     But it's the representation from the lessee that such commodity
       or such lading was noncorrosive or non-placarded because that
       was not amended or removed in the 2014 Amendment; correct?

**A.     Yes.**

Q.     All right. And the 2014 Amendment was the final lease
       document that carried us through until when the cars started to
       be returned by Georgia Power toward the end of 2017; right?

**A.     Yes.**

(Lewter Dep. at 118:22 – 119:05.)

**GATX Statement No. 31:**

In or about April 2018, Michael Dunn and other representatives of Southern

Company/Georgia Power met with Vulcan Materials. (PX 20: 4/2/2018 Dunn

email.)[6]

**GATX Statement No. 32:**

In an April 2, 2018 email following the meeting with Vulcan Materials,

Georgia Power's Michael Dunn wrote in part: "I think the meeting we had with

Vulcan was very informative. However, I left feeling, at the end of the day, GATX

---

[6] PX 20 was not previously attached to GATX's motion for summary judgment,
and is attached hereto.

will receive some amount from us to address the deterioration of the limestone cars."

(PX 20: 4/2/2018 Dunn email.)

**GATX Statement No. 33:**

Mr. Dunn's April 2, 2018 email does not make any reference to a 'course of dealing' or similar understanding that GATX and Georgia Power had ever agreed that Georgia Power would never be liable to pitting damage to the Cars. (PX 20: 4/2/2018 Dunn email.)

**GATX Statement No. 34:**

At his deposition, GATX's corporate representative, David Horwitz, testified:

> Q.      And what is your basis for saying that Georgia Power definitely caused the corrosion on the supplement 2 and supplement 3 cars?
>
> **A.      Because they had the cars since they were built and they were the only use of the cars and there was significant corrosion damage to the point where the cars have to be re-bodied.**

(Horwitz Dep. at 281:01 – 281:07.)

**GATX Statement No. 35:**

Jay Leadingham testified as follows at his deposition:

Q.      But you have no idea if corrosive limestone even exists, correct?

A.      **Well, apparently, it – it—Apparently, corrosive limestone exists, because that's what Georgia Power was putting in our cars.**

Q.      And how do you know that?

A.      **Because they put it in, and the cars corroded.**

Q.      How do you know that the limestone that Georgia – that Georgia Power put in the Supplement 2 and Supplement 3 cars was corrosive?

A.      **Deduction. They got brand new cars. They used them in that service, and they corroded.**

(Leadingham Dep. 157:07 – 158:23.)

**GATX Statement No. 36:**

Pursuant to Association of American Railroads Interchange Rule 107, a "depreciated value" or "DV" is calculated in a vacuum based on a variety of standardized inputs such as original cost, empty weight of a car and vintage. The AAR 107 DV does not consider, account for, or measure the condition of specific

railcars. Nor does it calculate a 'fair market value,' residual value, or future revenue stream of a specific railcar. (PX 21: Declaration of David Horwitz ¶¶ 3 -4.)[7]

**GATX Statement No. 37:**

In layman's terms, the DV essentially seeks to calculate an approximate value for what a railcar of a given size and vintage *should* be worth in the abstract assuming that such railcar has been properly serviced and maintained in the absence of intervening events or conditions. (PX 21: Declaration of David Horwitz ¶ 5.)

**GATX Statement No. 38:**

There are different industry uses and applications for the DV, including for insurance purposes. (PX 21: Declaration of David Horwitz ¶ 6.)

**GATX Statement No. 39:**

One use of the AAR 107 DV is as a settlement value for destroyed railcars. More specifically, the DV can be used to establish the liability that is due the owner if a customer/lessee destroys a railcar beyond repair. In effect, the DV calculates

---

[7] PX 21 was not previously attached to GATX's motion for summary judgment, and is attached hereto.

what the railcar asset itself should have been worth at the time it was destroyed. (PX 21: Declaration of David Horwitz ¶ 7.)

**GATX Statement No. 40:**

In this case, the DV is relevant to what the subject Cars *should* have been worth at the time they were returned by Georgia Power. The DV does not, however, calculate the actual value of the Cars in light of the extensive pitting damage or the cost to repair and return the Cars to interchange service. (PX 21: Declaration of David Horwitz ¶ 8.)

**GATX Statement No. 41:**

Out of the 160 Cars that are at issue, GATX has determined that 137 of the Cars can be repaired (rebodied) and safely returned to interchange service to fulfill the remainder of their service life of 50 years. Thus, the DV is not a measure of GATX's damages for those 137 Cars. (PX 21: Declaration of David Horwitz ¶ 9.)

**GATX Statement No. 42:**

GATX has determined, however, that the remaining 23 Cars were too extensively damaged to be safely returned to interchange service for the remainder of their full service life. Accordingly, the DV for those Cars (minus GATX's

19

recovery of any scrap proceeds) is a measure of GATX's damages. (PX 21: Declaration of David Horwitz ¶ 10.)

**GATX Statement No. 43:**

With its July 26, 2018 letter from Steve Pitts (DX 42), Georgia Power tendered a check to GATX for $115,674.38 for the following amounts:

> + $34,438.00 for <u>non-corrosion</u> repairs to the Supplement No. 2 (Bowen) Cars set forth in a referenced Billing Repair Card ("BRC").
>
> + $20,330.78 for <u>non-corrosion</u> repairs to the Supplement No. 3 (Wansley) Cars set forth in a referenced BRC.
>
> + 60,905.60 for stenciling costs.
>
> _____
>
> $115,674.38.

(DX 42: 7/26/2018 Steve Pitts Ltr. to Michael Sullivan at 1 - 2.)

**GATX Statement No. 44:**

Mr. Pitts' letter states "Lessee's combined payment for the end of lease repair costs for the Bowen Cars and Wansley Cars, as identified in the respective BRCs, and payment for stenciling of the Cars has been remitted." (DX 42: 7/26/2018 Steve Pitts Ltr. to Michael Sullivan at 2).)

20

**GATX Statement No. 45:**

Georgia Power's Rule 30(b)(6) representative, Christine Lewter, admitted that

Georgia Power did not believe that GATX was dropping its corrosion claim:

> Q.       …And my question is whether Georgia Power actually believed
>          for itself that GATX was releasing or waiving or foregoing its
>          corrosion claim in this case?
>
> **A.       Georgia Power believed that GATX still wanted to reach a
>          commercial settlement.**
>
> Q.       Okay. Is that – that a commercial resolution was GATX's
>          preference?
>
> **A.       That's correct.**
>
> Q.       And in fact that had been GATX's practice in the past with
>          other corrosion claims involving different cars?
>
> **A.       That's correct.**
>
> …
>
> Q.       All right. The first part is what you said a minute ago which is
>          that Georgia Power didn't actually believe that GATX was
>          actually going to drop its corrosion claim, right?
>
> **A.       Based on our history working with GATX.**

(Lewter Dep. at 126:16 – 127:07; 129:03 – 129:09.)

**GATX Statement No. 46:**

Steve Pitts, who signed Georgia Power's July 26, 2018 letter, also admitted that Georgia Power knew that GATX had not accepted a satisfaction of its corrosion claim:

> Q.      Practically speaking, there was no confusion about the fact that Georgia Power was denying that it was liable for corrosion, right?
>
> **A.      That's correct.**
>
> Q.      But practically speaking, was there any confusion at Georgia Power that GATX was maintaining that Georgia Power was liable for the corrosion?
>
> **A.      I can only answer for the smaller group [at] Georgia Power that we've been talking about plus any related attorneys, et cetera, but yeah, we were aware of both positions.**

(Pitts Dep. at 71:11 – 71:23.)

**GATX Statement No. 47:**

In October 2018, GATX initiated this lawsuit by filing a complaint against Georgia Power in the U.S. District Court for the Southern District of New York. (*See* Compl. (Dkt. #1) in *GATX Corporation v. Georgia Power Company*, Case No. 1:18-cv-09758-AJN, pending the U.S. District Court for the Southern District of New York.)

22

\*      \*      \*      \*

23

This 27th day of September, 2021.

*/s/ John C. Gekas*
John C. Gekas
  john.gekas@saul.com
Michael J. Pollock
  michael.pollock@saul.com
SAUL EWING ARNSTEIN & LEHR LLP
161 North Clark Street, Suite 4200
Chicago, IL 60601
Telephone:  312.876.7100

James W. Cobb
Georgia Bar No. 420133
  jcobb@caplancobb.com
T. Brandon Waddell
Georgia Bar No. 252639
  bwaddell@caplancobb.com
Caplan | Cobb LLP
75 Fourteenth Street NE, Suite 2750
Atlanta, GA 30309
Telephone:  404.596.5601

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that 14-point Times New Roman was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This 27th day of September, 2021.

*/s/ John C. Gekas*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 27, 2021, I electronically filed the

foregoing document with the CM/ECF e-filing system, which will automatically

send email notification of such filing to attorneys of record.


*/s/ John C. Gekas* _____