## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GATX CORPORATION,

       Plaintiff,

v.

GEORGIA POWER COMPANY,

       Defendant.

Civil Action File
No.: 1:19-cv-04790-AT

## DEFENDANT GEORGIA POWER COMPANY'S RESPONSE TO GATX'S STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO GEORGIA POWER'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant Georgia Power Company ("Georgia Power") hereby files its Response to Plaintiff GATX Corporation's ("GATX") Statement of Additional Facts in Opposition to Georgia Power's Motion for Summary Judgment ("GATX Statement of Additional Facts").

GATX did not respond to Georgia Power's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment [ECF Nos. 75-2, 77-2] as required by Local Rule 56.1(B)(2), 11th Circuit precedent, and this Court's Standing Order.  *See* ECF No. 6, § III(i).  Therefore, the Court should deem each of the facts

set forth in Georgia Power's Statement of Facts admitted.[1] GATX's failure to

properly respond prejudices Georgia Power's ability to directly reply to disputes on

evidence presented, as contemplated by Section III(i) of the Court's Standing Order.

Notwithstanding GATX's noncompliance with the rules of the Court, Georgia

Power responds to GATX's Statement of Additional Facts as follows:

1.

**GATX Statement No. 1:**

The subject Cars were brand new when delivered to Georgia Power. (PX 1-

A: Supplement No. 2 at ¶ 1. See also PX 12: Lewter Dep. at 112:11 – 112:14.)[2]

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that

the facts stated in GATX Statement No. 1 are immaterial to GATX's breach of

contract claim, because the condition of the Cars when Georgia Power returned them

---

[1] *Ovington v. Atlanta Inv. Grp., Inc.*, 651 F. App'x 951, 953 (11th Cir. 2016) ("Ovington's failure to comply with [Rule 56.1(B)'s] unambiguous requirements is not an unimportant defect…. That is why the rule imposes consequences on parties who fail to comply with its terms. Specifically it requires a district court to 'deem each of the movant's facts as admitted'" unless certain criteria are met); *see also, JP Morgan Chase Bank, N.A. v. Suarez*, 2014 U.S. Dist. LEXIS 188227, *36 (N.D. Ga. Mar. 10, 2014).

[2] In order to avoid duplicative filings, GATX's references to "PX #" refer to GATX's Exhibits filed in support of GATX's own motion for summary judgment. (*See* Dkt. #76-3 through #76-21, #84-1 through #84-7)

to GATX was consistent with ordinary wear and tear, as required under the Lease Documents.  [Deposition of Georgia Power Expert Mark J. Viz, Ph.D., P.E. ("Viz Dep.") at 163:18-164:3; PX 65A at 14-24, 72-74.]

2.

**GATX Statement No. 2:**

At the end of its lease, Georgia Power returned the Cars with extensive pitting damage. (PX 2 and PX 3: Inspection Reports; PX 6: Daum Report at 11 - 19.)[3]

**Defendant's Response:**

Disputed; inadmissible; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of "Ex. 2 Joint Inspection Report" [ECF No. 76-9] and "Ex. 3: 6/8/2018 Inspection Report" [ECF No. 76-10] as those documents have not been authenticated and do not constitute evidence supporting GATX's Motion for Summary Judgment.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power further states GATX's citation does not support the facts alleged. GATX did not file "Ex. 6: ESi Report of Phil Daum" as required by the Court's Standing Order [ECF No. 6] and Section II(J) of Appendix H to the Court's Local Civil Rules.

_____

[3] *See also* PX 7: Decl. of Phil Daum ¶¶ 5 – 7.

119784082

The document attached as "Ex. 2: Joint Inspection Report" to GATX's Motion for Summary Judgment [ECF No. 76-9] contains a 5-page inspection report bates-stamped GATXbGP000059-63 and a 4-page spreadsheet summarizing measurements. The document introduced as Plaintiff's Exhibit 2 in the Bank[4], Daum[5], Dunn[6], Horwitz[7], Pitts[8], and Mullins[9] Depositions in this matter included only the 5-page inspection report bates-stamped GATXbGP000059-63—it did not include the 4-page spreadsheet summarizing measurements. [*See e.g.*, Mullins Dep. at 72:21-73:1, (emphasis added) ("Q.  (By Mr. Gekas) All right.  For the record, I am sharing at my screen what I premarked as Plaintiff's Exhibit 2, which is a Maintenance Services Field Inspection Report drafted by Lawrence Bank, dated March 5th, 2018.  It's Bates-stamped GATXvGP59 through 63.").]

The document attached as "Ex. 3: 6/8/2018 Inspection Report" to GATX's Motion for Summary Judgment [ECF No. 76-10] contains a 4-page inspection report

---

[4] Deposition of GATX Manager of Field Inspection Lawrence Bank [retired] ("Bank Dep.").

[5] Deposition of GATX Expert Philip J. Daum ("Daum Dep.").

[6] Deposition of Southern Company Services ("SCS") Railcar Maintenance Manager Michael Dunn as Georgia Power Company's 30(b)(6) Witness ("Dunn 30(b)(6) Dep.").

[7] Deposition of David Horwitz as GATX 30(b)(6) Witness ("GATX 30(b)(6) Dep.").

[8] Deposition of SCS Fuel Procurement – Fuel Oil, Limestone, Railcar Employee [retired] Larry Steven Pitts ("Pitts Dep.").

[9] Deposition of Southern Company Services Railcar Specialist Harry Mullins [retired] ("Mullins Dep.").

4

and a 2-page spreadsheet summarizing measurements.  The document introduced as Plaintiff's Exhibit 3 in the Bank, Daum, Dunn, Horwitz, and Pitts Depositions in this matter included only the 4-page inspection report bates-stamped GATXbGP000055-58—it did not include the 2-page spreadsheet summarizing measurements.  [*See* PX 3.]

Georgia Power disputes GATX's allegations of "damage" to the Cars. [Deposition of SCS Fuels Principal Christine Lewter as Georgia Power Company's 30(b)(6) Witness ("Lewter 30(b)(6) Dep.") at 56:17-21.]  Instead, the condition of the Cars when Georgia Power returned them to GATX was consistent with ordinary wear and tear.  [Deposition of Georgia Power Expert Mark J. Viz, Ph.D., P.E. ("Viz Dep.") at 163:18-164:3; PX 65A at 14-24, 72-74.]  In particular, there is no evidence any of the Cars have collapsed, experienced complete wastage, or developed any through holes.  [████████████ at 271:2-272:1;  ████████ at 207:8-12.]

3.

**GATX Statement No. 3:**

The analysis of GATX's Engineering Department is that the pitting damage in the Cars jeopardizes the structural integrity of the Cars such that the Cars will have to be rebodied in order to safely realize their 50-year life. (PX 9: Dickman Decl.

119784082

¶ 4. PX 5: April 11, 2018 Buzas Email. PX 14: Buzas Dep. at 173:25 – 176:05; 206:15 – 207:10; 245:15 – 245:21; 298:22 – 299:09; 304:09 – 305:09.)

**Defendant's Response:**

Disputed; inadmissible; immaterial. Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of the material cited in support of GATX Statement No. 3, specifically, GATX's speculation "that the Cars will have to be rebodied." Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power further states the facts stated in GATX Statement No. 3 are immaterial to GATX's breach of contract claim because Georgia Power returned the Cars to GATX in a condition consistent with ordinary wear and tear, as required under the Lease Documents. GATX did not file "Exhibit 5: April 11, 2018 Buzas email" as required by the Court's Standing Order [ECF No. 6] and Section II(J) of Appendix H to the Court's Local Civil Rules.

GATX's Finite Element Analysis ("FEA") concluding the structural integrity of the Cars was jeopardized is significantly flawed. [Viz Dep. at 168:19-23, 288:8-11, PX 65A at 24-46.] GATX's own Engineer, Gabriel Buzas, admitted that GATX's FEA failed to model reality. [Buzas Dep. At 280:22-282:7.]

GATX has not presented evidence that establishes that the Cars had a 50-year life. [*See* ███ Dep. at 128:9-129:18, 130:19-25, 132:13-25, 162:23-164:1, DX 150; *id.* at 164:2-165:15, DX 151; *id.* at 169:11-170:14, PX 1; *id.* at 172:18-173:17;

Viz Dep. at 106:8-107:19, 207:12-208:21, 340:13-342:1, PX 65A at 44; Viz Decl.,

Ex. 1 at 8-10; GATX 30(b)(6) Dep. at 152:24-153:12; ███████ Dep. at 71:1-72:14;

Bank Dep. at 140:22-143:6.]

Georgia Power disputes GATX's allegations of "damage" to the Cars.

[Lewter 30(b)(6) Dep. at 56:17-21.]  Instead, the condition of the Cars when Georgia

Power returned them to GATX was consistent with ordinary wear and tear.  [Viz

Dep. at 163:18-164:3; PX 65A at 14-24, 72-74.]

4.

**GATX Statement No. 4:**

GATX's expert, Phil Daum, has concluded that it is an "absolute certainty"

that the Cars will have to be rebodied in order to safely realize their full service life.

(PX 8: Daum Dep. at 157:16 – 158:13; 161:02 – 161:14.)

**Defendant's Response:**

Disputed; unsupported; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii),

Georgia Power objects to the admissibility of the conclusory and speculative

statements cited in support of GATX Statement No. 4.  Pursuant to L.R.

56.1(B)(2)(a)(2)(iii), Georgia Power further states the that the cited material does

not support the facts stated in GATX Statement No. 4 and, in any event, those facts are immaterial to GATX's breach of contract claim.



[*See* Daum Dep. at 161:15-17

[*Id.* at 157:11-161:17 (emphasis added).]

[*Id.*]

[Daum Dep. at 162:23-164:1, DX 150; *id.* at 164:2-165:15, DX 151; *id.* at 169:11-170:14, PX 1.]

[*Id.* at 128:9-129:19, 130:19-25.]

[*Id.* at 132:12-25; 172:18-173:17.]

8

5.

**GATX Statement No. 5:**

The first opinion listed in Paragraph 1 on Page 5 of Phil Daum's expert report says: "1. The lading Georgia Power transported in the subject cars caused the corrosion damage to the subject cars." (PX 6: ESi Report of Phil Daum at p. 5, ¶ 1.)

**Defendant's Response:**

Disputed; inadmissible; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of the conclusory and speculative statements cited in support of Statement No. 5.  GATX did not file "Ex. 6: ESi Report of Phil Daum" as required by the Court's Standing Order [ECF No. 6] and Section II(J) of Appendix H to the Court's Local Civil Rules.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    [GATX  30(b)(6)  Dep.  at  190:24-192:13,  223:1-9,  PX  1  at GATXvGP000005 (§ 5.2); *id.* at 280:20-281:22.]

████████████████████████████████████████████████████

███████████████████████████████████

[Daum Dep. at 80:3-81:24 (emphasis added).]   Furthermore, GATX did not eliminate alternative causes of the alleged damage, such as a potential metal or design defect. ████████████████████████████

████████████████████████████████████

██████████████████████

6.

**GATX Statement No. 6:**

Section 2.5, titled "Net Leases," provides that "Lessee shall have no right to…be released, relieved or discharged from the obligation or liability to make all payments due thereunder for any reason whatsoever, including but not limited to the following: …any defect in, or damage to, or loss or destruction of, any Car from any cause." (PX 1: Master Lease § 2.5 (emphasis added). See also Ex. 12: Lewter Dep. 102:15 – 103:04 (regarding Section 2.5, "You asked does it mean what it says. I would say yes.").)

**Defendant's Response:**

Undisputed, but immaterial.  Specifically, Section 2.5 identifies the Lease as a "net lease" and provides rent obligations are not subject to offset.  [███████████████

Dep. at 220:5-221:4, PX 1 at GATXvGP000003, § 2.5.]  This provision does not render Georgia Power liable for corrosion, pitting, or "ordinary wear and tear."  [*Id.*]

7.

**GATX Statement No. 7:**

Section 9.1, titled, "Risk of Loss; Damages," and states: "Lessee shall bear all risk of, and shall be solely responsible for, any…damage of or to each Car, however caused," and further, that "Lessee shall bear all costs, charges and expenses related to each Car." (PX 1: Master Lease § 9.1 (emphasis added). See also Ex. 12: Lewter Dep. at 111:09 – 13 ("Q. So what Section 9.1 says is that the less bears all risk of loss or damages to each car however caused unless otherwise expressly provided in the relevant lease; right? A. Yes.").)

**Defendant's Response:**

Disputed; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 7.

Section 9.1 states:

9.1 Risk of Loss; Damages. From the Acceptance Date of each Car until the return of each Car to Lessor in the condition required in Section 8, excluding any subsequent storage period, (i) Lessee shall bear all risk of, and shall be solely responsible for, any loss, theft, governmental seizure (if not caused by the action or inaction of Lessor), appropriation, destruction and damage of or to each Car, however caused, and all

11

physical or other damage to persons or property caused by each Car or Lessee's (or any sublessee's or other party's) use, maintenance operation or possession thereof, and (ii) Lessee shall bear all costs, charges and expenses related to each Car, <u>unless otherwise expressly provided in the relevant Lease</u>.

[PX 1 at GATXvGP000012, § 9.1 (emphasis added).]

 "damage" does not include "ordinary wear and tear" and that if the Cars were returned in a condition consistent with ordinary wear and tear, Section 9.1 does not apply. [███████████ Dep. at 236:19-238:7.]

8.

**GATX Statement No. 8:**

With respect to Paragraph 5 of Supplement Nos. 2 and 3, Ms. Lewter testified at her deposition as follows:

> Q.   All right. So that means that Georgia Power is representing that it was not placing a corrosive or placarded commodity in the car; right?
>
> A.   Yes.
>
> …
>
> Q.   All right. So it is fair to say that Georgia Power understood that it could not put a corrosive commodity in the car; correct?
>
> A.   Georgia Power understands that it was allowed to put limestone or gypsum in the railcars.
>
> Q.   Okay. And it represented that such commodity was noncorrosive?
>
> A.   Yes.

12

(PX 12: Lewter Dep. at 112:25 – 113:04; 113:24 – 114:08). *See also* PX 1-A & 1-B: Supplement Nos. 2 & 3 at ¶ 5)

**Defendant's Response:**

Unsupported and incomplete.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 8.  Ms. Lewter testified that Paragraph 5 of Supplement Nos. 2 and 3 provides that Georgia Power would be using the Cars in aggregate service and represented that the limestone or gypsum aggregate that it would be carrying in the Cars is a non-corrosive, non-placarded commodity.  [Lewter Dep. at 112:7-114:4, 116:1-22.]

9.

**GATX Statement No. 9:**

GATX's claim is based on the pitting damage in the bottom of the Cars. (PX 9: Dickman Decl. ¶ 4; PX 17: Kane Dep. at 109:10 – 109:17.)

**Defendant's Response:**

Disputed; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 9.

13

GATX's Complaint does not reference "pitting," but refers to "corrosion" seven times. *See* Complaint ("Compl.") [ECF No. 1], ¶¶ 1, 3, 4, 44, 51, 53 and subheading preceding ¶ 42 ("The Unrepaired Corrosion Damage to the Cars").

████████████████████████████████████████████████

█████████████████████████████

Dr. Kane testified that he understood GATX pointed to pitting in the Cars as the basis of its claim. [Kane Dep. at 109:10-17.] Dr. Kane did not adopt GATX's counsel's characterization of the pitting as "damage." [*Id.*]

Georgia Power disputes GATX's allegations of "damage" to the Cars. [Lewter 30(b)(6) Dep. at 56:17-21.] Instead, the condition of the Cars when Georgia Power returned them to GATX was consistent with ordinary wear and tear. [Viz Dep. at 163:18-164:3; PX 65A at 14-24, 72-74.]

10.

**GATX Statement No. 10:**

At his deposition, Georgia Power's Rule 30(b)(6) witness on the condition of the Cars, Michael Dunn, testified as follows:

Q.    Has Georgia Power analyzed the structural integrity of the cars?

A.    No.

> Q.   Has Georgia Power done an engineering analysis of what – what sorts or lengths of service the cars were suitable for at the time they were returned?
>
> A.   No.

(Dunn Dep. at 57:06 – 57:15.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 10 are immaterial to GATX's breach of contract claim.  Furthermore, the quotation excerpted in GATX Statement No. 10 inaccurately excludes Georgia Power's counsel's objections.

11.

**GATX Statement No. 11:**

At his deposition, Georgia Power's inspector, Harry Mullins, testified:

> Q.   Prior to returning the cars, did – do you know whether Georgia Power did any kind of engineering analysis on the structural integrity of the cars?
>
> A.   Not that I'm aware of.

(Mullins Dep. at 81:10 – 81:18.)[10]

---

[10] Pursuant to this Court's standing order, Mr. Mullins complete transcript is filed at both Dkt. #86 and Dkt. #103.

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 11 are immaterial to GATX's breach of contract claim.  Furthermore, the quotation excerpted in GATX Statement No. 11 inaccurately excludes Georgia Power's counsel's objections.

12.

**GATX Statement No. 12:**

At his deposition, GATX's inspector, Larry Bank, testified:

Q.      Is pitting on the body of a ten-year-old steel open-top hopper consistent with ordinary wear and tear?

A.      In my opinion, no. Pitting – pitting is not normal wear and tear, in my opinion. No.

(Bank Dep. at 112:13 - 113:20.)[11]

**Defendant's Response:**

Inadmissible; immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of the material cited in support of GATX Statement No. 12, specifically, Mr. Bank's lay opinion testimony regarding "normal wear and tear" or "ordinary wear and tear."  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power further states the facts stated in GATX Statement No. 12 are

---

[11] Mr. Bank's complete deposition transcript is filed at Dkt. #92.

immaterial to GATX's breach of contract claim because Mr. Bank testified that he does not have personal knowledge of the "ordinary" or "normal" condition of ten-year-old steel open-top hoppers used to carry aggregate.  [Bank Dep. 65:17-76:20.] Instead, Mr. Bank testified at length that "every case is different."  [*Id.* at 68:1, 68:22-23, 69:25, 70:1, 76:9-10.]  Mr. Bank also admitted he did not compare the Cars to other railcars of a similar age and intended use to determine whether the condition of the Cars was consistent with "normal wear and tear" or "ordinary wear and tear."  [*Id.* at 103:20-104:13.]

13.

**GATX Statement No. 13:**

At his deposition, Larry Bank testified:

Q. …do you have personal knowledge of the body of any steel open-top hopper where there was – there was pitting and the condition of the car was consistent with ordinary wear and tear?

A. No, I can't think of a situation where a car would have pitting and that would be considered normal wear and tear.

(Bank Dep. at 114:05 – 114:16.)

**Defendant's Response:**

Inadmissible; immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of the material cited in support of GATX Statement No. 13, specifically, Mr. Bank's lay opinion testimony regarding "normal

wear and tear" or "ordinary wear and tear."  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii),
Georgia Power further states the facts stated in GATX Statement No. 13 are
immaterial to GATX's breach of contract claim because Mr. Bank testified that he
did not have personal knowledge of the "ordinary" or "normal" condition of ten-
year-old steel open-top hoppers used to carry aggregate.  [Bank Dep. 74:14-76:20.]
Instead, Mr. Bank testified at length "every case is different."  [*Id.* at 68:1, 68:22-
23, 69:25, 70:1, 76:9-10, 83:25-84:1.]  Mr. Bank also admitted he did not compare
the Cars to other railcars of a similar age and intended use to determine whether the
condition of the Cars was consistent with "normal wear and tear" or "ordinary wear
and tear."  [*Id.* at 103:20-104:13.]

14.

**GATX Statement No. 14:**

When properly serviced and maintained, the Cars are intended for a 50-year
service life. (PX 6: Daum Report at 4 (citing NSC Specification P-392 and AAR
Field Manual Rule 88.A.1). *See also* PX 9: Declaration of Tyler Dickman ¶ 3; PX
16: Viz Dep. at 336:20 – 338:09.)

**Defendant's Response:**

Disputed; unsupported; immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii),
Georgia Power states that the cited material does not support the facts stated in

18

GATX Statement No. 14 and, in any event, those facts are immaterial to GATX's breach of contract claim because there is no "50-year service life" for the Cars and such non-existent service life is not relevant to determining whether Georgia Power performed under the Lease Documents.   Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power further states GATX's citation does not support the facts alleged. GATX did not file "Ex. 6: ESi Report of Phil Daum" as required by the Court's Standing Order [ECF No. 6] and Section II(J) of Appendix H to the Court's Local Civil Rules.



██████████████████████████████ AAR Field Manual Rule 88.A.1, or the Lease Documents[12] establishes an intended service life for the Cars.  [████████ at 162:23-164:1, DX 150.  ████████████████████████████████████

████████████████████████████████████████

████████████████████ *id.* at 164:2-165:11, DX 151 ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ *id.* at 169:11-170:14, PX 1 ████████████████

---

[12] Hereinafter, Georgia Power refers to the Master Lease, Supplements 2 and 3, 2012 Extension, and 2014 Renewals collectively as the "Lease Documents."  *See* PX 1.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

The AAR Field Manual 88.A.1 provides a regulatory ceiling—requiring railcars to be removed from interchange service after 50 years—not the intended service life of the Cars. [DX 151 (Rule 88.A.1(a): "Cars built on or after July 1, 1974 are limited to 50 years of service from month and year built."). *See also* Viz Dep. at 106:8-107:19, 340:13-342:1, PX 65A at 44 ("The AAR Interchange Rules and FRA regulations limit the service life of railcars to 50 years (unless certain additional measures are taken based on a number of inputs)."); Viz Decl., Ex. 1 at 8-10; ████████████████ at 152:24-153:12; ████████████ at 71:1-72:14; Bank Dep. at 140:22-143:6.]

████████████████████████████████ very few railcars remain in service for 50 years; instead, the intended service life of a specific railcar is determined by a railcar lessor's general fleet profile and fleet experience, norms, and data. [*See* ██████ Dep. at 128:9-129:18, 130:19-25. *See also* Viz Dep. 207:12-208:21 (noting that with access to complete records, inspection reports, and measurements related to railcars of the same type and in the same service as the Cars at issue in this case, one might be able to determine the expected life of the Cars—

119784082

but no such evidence has been produced in this case).] ████████ did not review

GATX's fleet experience, norms, or data. [████ Dep. at 132:12-25, 172:18-

173:17.]    GATX repeatedly refused to provide discovery regarding its fleet

experience, norms, and data related to ██████████████████████████████[13]

and, therefore, has no evidence of the alleged "intended service life" of such cars.

[*See* March 9, 2021 Consolidated/Joint Discovery Statement [ECF No. 46]; August

5, 2021 Consolidated Joint Discovery Statement [ECF No. 70].]

15.

**GATX Statement No. 15:**

At the end of Georgia Power's lease (from approximately 2007 – 2017),

GATX's bargain with Georgia Power was that Georgia Power would return the Cars

with 35 – 40 years of useful life remaining. (PX 1: Master Lease §§ 2.5, 3.1, 6.1,

8.2, 9.1. *See also* PX 9: Dickman Decl. ¶¶ 3 – 4; NY UCC § 2-A-532.)

---

[13] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████ [GATX 30(b)(6) Dep. at 112:25-113:13, 166:10-167:22, 168:2-4; PX 1
at GATXvGP000027, GATXvGP000034.]

21

**Defendant's Response:**

Disputed; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 15.

The parties' "bargain" did not include any agreement with respect to the life of the Cars.  [*See* ▉▉▉ Dep. at 128:9-129:18, 130:19-25, 132:13-25, 162:23-164:1, DX 150; *id.* at 164:2-165:15, DX 151; *id.* at 169:11-170:14, PX 1; *id.* at 172:18-173:17; Viz Dep. at 106:8-107:19, 207:12-208:21, 340:13-342:1, PX 65A at 44; Viz Decl., Ex. 1 at 8-10; GATX 30(b)(6) Dep. at 152:24-153:12; ▉▉▉ Dep. at 71:1-72:14; Bank Dep. at 140:22-143:6.]

16.

**GATX Statement No. 16:**

Merriam-Webster Dictionary defines "corrosive" as "tending or having the power to corrode." (See https://www.merriam-webster.com/dictionary/corrosive.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 16 are immaterial to GATX's breach of contract claim because the word "corrosive" does not appear independently in the Lease Documents and the term "non-corrosive, non-placarded commodity"—which

22

does appear in the Lease Documents—is defined by DOT regulations, which are expressly incorporated by the Lease Documents.  [Bank Dep. at 117:13-118:8, 121:12-16; ███ Dep. at 179:20-180:13; ███ Dep. at 243:20-244:7; Deposition of GATX Vice President of Coal and Steel Jay Leadingham ("Leadingham Dep.") at 22:2-23:4; PX1 at GATXvGP000005, § 5.3]

17.

**GATX Statement No. 17:**

Dictionary.com similarly defines "corrosive" as "having the quality of corroding or eating away; erosive."  (See https://www.dictionary.com/browse/corrosive.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 17 are immaterial to GATX's breach of contract claim because the word "corrosive" does not appear independently in the Lease Documents and the term "non-corrosive, non-placarded commodity"—which does appear in the Lease Documents—is defined by DOT regulations, which are expressly incorporated by the Lease Documents.  [Bank Dep. at 117:13-118:8, 121:12-16; ███ Dep. at 179:20-180:13; ███ Dep. at 243:20-244:7;

Deposition of GATX Vice President of Coal and Steel Jay Leadingham ("Leadingham Dep.") at 22:2-23:4; PX1 at GATXvGP000005, § 5.3]

18.

**GATX Statement No. 18:**

At his deposition, Georgia Power's expert, Mark Viz, testified:

Q.    I'm asking if you can give me a plain and ordinary definition of "corrosive."

A.    And I think I've done that.

Q.    And that definition is something that is corrosive is that which leads to corrosion. Correct?

A.    A corrosive material is one that is somehow connected to or leads to or a somehow is – drives the mechanism of corrosion.

(Viz Dep. at 159:03 – 18.)

**Defendant's Response:**

Immaterial. Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 18 are immaterial to GATX's breach of contract claim because the word "corrosive" does not appear independently in the Lease Documents and the term "non-corrosive, non-placarded commodity"—which does appear in the Lease Documents—is defined by DOT regulations, which are expressly incorporated by the Lease Documents. [Bank Dep. at 117:13-118:8, 121:12-16; ███ Dep. at 179:20-180:13; ███████ Dep. at 243:20-244:7;

Deposition of GATX Vice President of Coal and Steel Jay Leadingham ("Leadingham Dep.") at 22:2-23:4; PX1 at GATXvGP000005, § 5.3] Furthermore, the quotation excerpted in GATX Statement No. 18 inaccurately excludes Georgia Power's counsel's objections and GATX's counsel's interruptions of the witness' answer.

19.

**GATX Statement No. 19:**

In acknowledging Georgia Power's representation to GATX in Paragraph 5 of Supplement Nos. 2 & 3 that Georgia Power's gypsum and limestone was "noncorrosive," Ms. Lewter did not mention Title 49 of the Code of Federal Regulations. (PX 12: Lewter Dep. at 112:25 – 113:04; 113:24 – 114:08).)

**Defendant's Response:**

Disputed; unsupported; immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 19 and, in any event, those facts are immaterial to GATX's breach of contract claim.

Ms. Lewter testified that Paragraph 5 of Supplement Nos. 2 and 3 provides that Georgia Power would be using the Cars in aggregate service and represented

that the limestone or gypsum aggregate that it would be carrying in the Cars is a non-corrosive, non-placarded commodity.  [Lewter Dep. at 112:7-114:4, 116:1-22.]

The Lease Documents expressly incorporate DOT regulations, including Title 49 of the Code of Federal Regulations.  [PX1 at GATXvGP000005, § 5.3 ("Lessee shall at all times comply . . . with all governmental and other applicable statutes, laws, regulations, rules, directives, ordinances and requirements, including, without limitation, the rules and regulations of the DOT . . . .").]

DOT regulations define the term "non-corrosive, non-placarded commodity." [Bank Dep. at 117:13-118:8, 121:12-16; ████ Dep. at 179:20-180:13; ████ ████ Dep. at 243:20-244:7; Deposition of GATX Vice President of Coal and Steel Jay Leadingham ("Leadingham Dep.") at 22:2-23:4.]  Limestone and gypsum are "non-corrosive, non-placarded commodit[ies]." [Dunn 30(b)(6) Dep. at 40:9-41:24, PX 10 at GATXvGP000255-60; Pitts Dep. at 17:17-18:11; *see* Carmeuse Certification of Business Records; Hanson Certification of Business Records; Lhoist

Certification of Business Records; Vulcan Materials Certification of Business Records.]

20.

**GATX Statement No. 20:**

Ms. Lewter did not mention Title 49 of the Code of Federal Regulations at *any* time during her deposition. (Lewter Dep, passim.)

**Defendant's Response:**

Immaterial; non-compliant with L.R. 56.1(B)(1).   Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 20 are immaterial to GATX's breach of contract claim. Furthermore, GATX's "passim" citation to Mr. Lewter's deposition does not comply with L.R. 56.1(B)(1)(a), requiring the citations to evidence to include a page or paragraph number.

21.

**GATX Statement No. 21:**

At his deposition, Georgia Power's expert, William Kane, testified:

Q.   Okay. And so, in other words, the presence of the commodity in the bottom of the cars plays a role in the presence and extent of the pitting corrosion or the pitting damage or the localized corrosion that we see in the bottom of the cars; is that right?

A.   Right.

27

Any time you have any material that's going to be stacked up against the surface like that, you're going to have a much different environment at that surface than if it was just open to the air like we would suspect with the very top of the – of the sheets there [sic] is exposed to.

Q.   So, in other words, in the absence of the commodity, we would expect to see the more general rust or atmospheric corrosion that's visible at the top of the cars that we saw in figure 11 [of Exponent's own report]?

A.   Probably, yes.

…

Q   And so you would agree with me that absent the commodity in this case, that you would not expect the same level or a similar level of pitting in the bottoms of the cars as we have here?

A.   Yes. If the cars spent their lives not carrying anything, they would have different surface conditions.

(Kane Dep. at 86:03 – 86:22; 190:21 – 191:03.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 21 are immaterial to GATX's breach of contract claim.  Furthermore, the quotations excerpted in GATX Statement No. 21 inaccurately exclude Georgia Power's counsel's objections.

22.

**GATX Statement No. 22:**

On or about November 11, 2016, Georgia Power's Harry Mullins wrote to Christine Lewter: "The gypsum is very corrosive to the steel cars." (PX 19: 11/11/2016 Mullins Email.)[14]

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 22 are immaterial to GATX's breach of contract because the word "corrosive" does not appear independently in the Lease Documents and the term "non-corrosive, non-placarded commodity"—which does appear in the Lease Documents—is defined by DOT regulations, which are expressly incorporated by the Lease Documents.  [Bank Dep. at 117:13-118:8, 121:12-16; ███ Dep. at 179:20-180:13; ███████ Dep. at 243:20-244:7; Deposition of GATX Vice President of Coal and Steel Jay Leadingham ("Leadingham Dep.") at 22:2-23:4; PX1 at GATXvGP000005, § 5.3]

---

[14] PX 19 was not attached to GATX's motion for summary judgment, and is therefore attached hereto.

23.

**GATX Statement No. 23:**

At his deposition, GATX's expert, Phil Daum, testified:

Q.   And do you have any opinion as to – do you have any opinion as to whether the definition applied in the hazmat regulations applies to the master lease agreement at issue in this case?

A.   Yes.

Q.   Okay. And what is that opinion?

A.   That they don't.

Q.   And why is that?

A.   Both gypsum and limestone are non-hazardous materials and, therefore, are not – that section does not apply.

…

Q.   I just want to make clear that it was your testimony that the terminology of non-corrosive non-placarded commodities under Title 49 of the Code of Federal Regulations on the one hand and the transportation of limestone or gypsum at issue in this case on the other hand are two different things?

A.   Yes.

(Daum Dep. 182:01 – 14 (emphasis added); 261:09 – 19.)

**Defendant's Response:**

Disputed; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of GATX's expert's interpretation of the terms of the Lease Documents cited in support of Statement No. 23.  Furthermore, the quotation

30

excerpted in GATX Statement No. 23 inaccurately excludes Georgia Power's counsel's objection.

The Lease Documents expressly incorporate DOT regulations, including Title 49 of the Code of Federal Regulations.  [PX1 at GATXvGP000005, § 5.3 ("Lessee shall at all times comply . . . with all governmental and other applicable statutes, laws, regulations, rules, directives, ordinances and requirements, including, without limitation, the rules and regulations of the DOT . . . .").]

DOT regulations define the term "non-corrosive, non-placarded commodity." [Bank Dep. at 117:13-118:8, 121:12-16; ▉▉▉ Dep. at 179:20-180:13; ▉▉▉ ▉▉▉ Dep. at 243:20-244:7; Leadingham Dep. at 22:2-23:4.]  Limestone and gypsum are "non-corrosive, non-placarded commodit[ies]." [Dunn 30(b)(6) Dep. at 40:9-41:24, PX 10 at GATXvGP000255-60; Pitts Dep. at 17:17-18:11; *see* Carmeuse Certification of Business Records; Hanson Certification of Business Records; Lhoist Certification of Business Records; Vulcan Materials Certification of Business Records.]

24.

**GATX Statement No. 24:**

Georgia Power's expert, William Kane, testified at his deposition:

31

Q.    Okay. But so that means that you don't know whether the Title 49 of the Code of Federal Regulations applies or governs open-top hoppers like those at issue in this case?

A.    I know that it would not apply because those materials would not be considered hazardous.

(Kane Dep. at 118:19 – 119:02 (emphasis added).)

**Defendant's Response:**

Undisputed, although the quotation excerpted in GATX Statement No. 24 inaccurately excludes Georgia Power's counsel's objection.

The Lease Documents expressly incorporate DOT regulations, including Title 49 of the Code of Federal Regulations.  [PX1 at GATXvGP000005, § 5.3 ("Lessee shall at all times comply . . . with all governmental and other applicable statutes, laws, regulations, rules, directives, ordinances and requirements, including, without limitation, the rules and regulations of the DOT . . . .").]

DOT regulations define the term "non-corrosive, non-placarded commodity." [Bank Dep. at 117:13-118:8, 121:12-16; ███ Dep. at 179:20-180:13; ███ ███ Dep. at 243:20-244:7; Leadingham Dep. at 22:2-23:4.]  Limestone and gypsum are "non-corrosive, non-placarded commodit[ies]." [Dunn 30(b)(6) Dep. at 40:9-41:24, PX 10 at GATXvGP000255-60; Pitts Dep. at 17:17-18:11; *see* Carmeuse Certification of Business Records; Hanson Certification of Business

Records; Lhoist Certification of Business Records; Vulcan Materials Certification of Business Records.]

25.

**GATX Statement No. 25:**

At his deposition, Georgia Power's expert, Mark Viz, testified:

Q.      The definitions that Dr. Kane and you have relied on from Title 49, the Code of Federal Regulations, with respect to corrosion are not included in the Master Lease; right?

A.      They are not, correct. They are not in the Master Lease.

(Viz Dep. at 280:03 – 09.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 25 (*i.e.*, the lack of specific definitions from Title 49 included in the Lease Documents) are immaterial to GATX's breach of contract claim because the Lease Documents incorporate DOT regulations as a whole, both expressly and as a matter of law.  Furthermore, the quotation excerpted in GATX Statement No. 25 inaccurately excludes Georgia Power's counsel's objection.

The Lease Documents expressly incorporate DOT regulations, including Title 49 of the Code of Federal Regulations.  [PX1 at GATXvGP000005, § 5.3 ("Lessee

shall at all times comply . . . with all governmental and other applicable statutes, laws, regulations, rules, directives, ordinances and requirements, including, without limitation, the rules and regulations of the DOT . . . .").]

DOT regulations, specifically Title 49, define the term "non-corrosive, non-placarded commodity."  [Bank Dep. at 117:13-118:8, 121:12-16; █████ Dep. at 179:20-180:13; ██████████ Dep. at 243:20-244:7; Leadingham Dep. at 22:2-23:4.]  Limestone and gypsum are "non-corrosive, non-placarded commodit[ies]." [Dunn 30(b)(6) Dep. at 40:9-41:24, PX 10 at GATXvGP000255-60; Pitts Dep. at 17:17-18:11; *see* Carmeuse Certification of Business Records; Hanson Certification of Business Records; Lhoist Certification of Business Records; Vulcan Materials Certification of Business Records.]

26.

**GATX Statement No. 26:**

Christine Lewter testified at her deposition:

Q.    Okay. Am I correct that prior to this particular case any disputes between GATX and Georgia Power regarding corrosion in railcars were resolved through commercial resolution?

A.    That is correct. This is the third corrosion claim that we have received from GATX, and the prior two were resolved through commercial dealings.

(Lewter Dep. at 35:13 – 21.)

**Defendant's Response:**

Undisputed.

27.

**GATX Statement No. 27:**

Jay Leadingham testified at his deposition:

Q.   Okay. And then Miss Campbell also asked you a series of questions about the – some of the prior disagreements or disputes between GATX and Georgia Power about whether Georgia Power was responsible for corrosion to those coal cars, correct?

A.   Correct.

Q.   She showed you a series of e-mails back and forth where you guys were trying to work out what I think you called a commercial resolution?

A.   Correct.

Q.   Did – Did I get your terminology right, commercial resolution?

A.   Yes.

Q.   Okay. And commercial resolution is another word for settlement, isn't it?

A.   Yeah. I mean, there's a – Yeah. There's a dispute and you resolve it.

Q.   Yeah. And the e-mails back and forth were efforts at trying to reach a compromise between GATX and Georgia Power about the corrosion in those different cars that aren't at issue in this lawsuit?

A.   Well, absolutely. Yeah.

Q.   So, for example, when GATX or you would make a – send an e-mail in trying to work out the disagreement, you were making an offer of

compromise to Georgia Power as a way to try to avoid litigation like we've, unfortunately, not been able to avoid in this case?

A.    A hundred percent correct. As a sales commercial person, you want happy customers. You want to grow business. Getting in any type of litigation is the absolute last thing you want to do. You want to strengthen relationships, build relationships, grow business, not, you know not – not the opposite.

(Leadingham Dep. at 248:01 – 249:17.)

**Defendant's Response:**

Undisputed.

28.

**GATX Statement No. 28:**

Georgia Power's corporation representative, Christine Lewter, testified at her

deposition:

Q.    Okay. So Georgia Power had already signed the master lease and Supplement 2 and 3 when you say Jay told you that this master lease was silent on corrosion?

A.    Yes.

(Lewter Dep. at 145:15 – 19.)

36

119784082

**Defendant's Response:**

Undisputed.

29.

**GATX Statement No. 29:**

Georgia Power's Chad Hewitt testified at his deposition:

Q.    When you had this correspondence with other people at Georgia Power
      or Southern Company, did you ever have discussions about changing
      any terms of the master lease when you were having these lease
      extension negotiations?

A.    You know, I don't recall wanting to change the terms of the master
      lease. And, you know, I would assume if we had or wanted to change
      terms of a master lease, that that would have been denoted and -- and
      the language would have been papered up in the extension of lease two
      and three, or supplement two and three.

(Hewitt Dep. at 26:12 – 26:23.)

**Defendant's Response:**

Undisputed.

30.

**GATX Statement No. 30:**

Christine Lewter testified at her deposition:

Q.    And then in the 2014 Amendment [the Master Lease] was amended to
      specify that it was for gypsum or limestone service?

**A.    That's correct.**

119784082

Q.   But it's the representation from the lessee that such commodity or such lading was noncorrosive or non-placarded because that was not amended or removed in the 2014 Amendment; correct?

**A.**   **Yes.**

Q.   All right. And the 2014 Amendment was the final lease document that carried us through until when the cars started to be returned by Georgia Power toward the end of 2017; right?

**A.**   **Yes.**

(Lewter Dep. at 118:22 – 119:05.)

**Defendant's Response:**

Undisputed.

31.

**GATX Statement No. 31:**

In or about April 2018, Michael Dunn and other representatives of Southern Company/Georgia Power met with Vulcan Materials. (PX 20: 4/2/2018 Dunn email.)[15]

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 31 are immaterial to GATX's breach of contract claim.

---

[15] PX 20 was not previously attached to GATX's motion for summary judgment, and is attached hereto.

32.

**GATX Statement No. 32:**

In an April 2, 2018 email following the meeting with Vulcan Materials, Georgia Power's Michael Dunn wrote in part: "I think the meeting we had with Vulcan was very informative. However, I left feeling, at the end of the day, GATX will receive some amount from us to address the deterioration of the limestone cars." (PX 20: 4/2/2018 Dunn email.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 32 are immaterial to GATX's breach of contract claim.

Mr. Dunn confirmed that nothing in his April 2, 2018 e-mail constituted an admission of liability.  [Dunn Dep. at 97:6-98:3, PX 23 (emphasis added) ("Q.  (By Mr. Gekas) All right.  If we go to Plaintiff's Exhibit 23, and we look at the first paragraph, the second sentence says, 'However, I left feeling at the end of the day GATX will receive some amount from us to address the deterioration of the limestone cars.' What did you mean by that?  A.  By that sentence I meant that – I meant – excuse me – that there have been claims concerning the rusting, pitting, corrosion-type thing that we've talked about; and that as part of those negotiations

119784082

<u>to reach a settlement, odds would be that we probably would have to pay something</u>

<u>to reach a resolution even though the use of the cars – even though we had used the</u>

<u>cars as we had intended, or as the lease intended, and the pitting and rust that we saw</u>

<u>and talked about was normal wear and tear</u>.   Q.   And why did you believe that

Georgia Power would probably have to make some payment to GATX in order to

resolve those claims in spite of Georgia Power's position that it was ordinary wear

and tear?  A.  I just – I can only say from pragmatic point of view that I thought it

was possible.").]

33.

**GATX Statement No. 33:**

Mr. Dunn's April 2, 2018 email does not make any reference to a 'course of

dealing' or similar understanding that GATX and Georgia Power had ever agreed

that Georgia Power would never be liable to pitting damage to the Cars. (PX 20:

4/2/2018 Dunn email.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that

the facts stated in GATX Statement No. 33 are immaterial to GATX's breach of

contract claim.

40

Mr. Dunn was not designated as a 30(b)(6) witness on topics related to Georgia Power's course of dealing or performance with GATX.  [Dunn 30(b)(6) Dep. at 12:2-13:15, PX 29.]  There is no evidence Michael Dunn had personal knowledge of the relevant course of dealing or performance between GATX and Georgia Power—Cheryl Gulledge, Christine Lewter, and Chad Hewitt were the representatives who negotiated with GATX on behalf of Georgia Power during the relevant course of dealing and performance.  [Leadingham Dep. at 37:16-38:5, 72:1-17, DX 7; *id.* at 79:18-81:25, DX 8; *id.* at 95:21-99:1, DX 10; *id.* at 99:2-102:21, DX 11; *id.* at 167:22-172:8, DX 27, DX 28; *id.* at 178:8-181:25, DX 30 at GPC_NDGA_0000011355; *id.* at 185:8-188:2, DX 34; *id.* at 188:3-190:24, DX 35 at GPC_NDGA_0000011545; *id.* at 192:8-194:7, DX 37; *id.* at 199:3-203:21, DX 40; *id.* at 201:18-21, 207:6-15; Deposition of SCS Railcar Utilization & Contract Manager Chad S. Hewitt ("Hewitt Dep.") at 37:8-40:4, PX Hewitt 2; *id.* at 40:22-41:22, PX Hewitt 3; Declaration of Cheryl Gulledge ("Gulledge Decl."), ¶¶ 3-8.]

34.

**GATX Statement No. 34:**

At his deposition, GATX's corporate representative, David Horwitz, testified:

Q.     And what is your basis for saying that Georgia Power definitely caused the corrosion on the supplement 2 and supplement 3 cars?

119784082

**A.     Because they had the cars since they were built and they were the
only use of the cars and there was significant corrosion damage to
the point where the cars have to be re-bodied.**

(Horwitz Dep. at 281:01 – 281:07.)

**Defendant's Response:**

Disputed; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power

objects to the admissibility of the conclusory, speculative statements and lay opinion

testimony cited in support of Statement No. 34.

GATX does not know what caused the corrosion in the Cars. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

35.

**GATX Statement No. 35:**

Jay Leadingham testified as follows at his deposition:

Q.     But you have no idea if corrosive limestone even exists, correct?

**A.     Well, apparently, it – it—Apparently, corrosive limestone exists,
because that's what Georgia Power was putting in our cars.**

42

Q.   And how do you know that?

**A.   Because they put it in, and the cars corroded.**

Q.   How do you know that the limestone that Georgia – that Georgia Power put in the Supplement 2 and Supplement 3 cars was corrosive?

**A.   Deduction. They got brand new cars. They used them in that service, and they corroded.**

(Leadingham Dep. 157:07 – 158:23.)

**Defendant's Response:**

Disputed; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(ii), Georgia Power objects to the admissibility of the conclusory, speculative statements and lay opinion testimony cited in support of Statement No. 35.

Limestone and gypsum are "non-corrosive, non-placarded commodit[ies]." [Daum Dep. at 179:20-180:13.  *See also* GATX 30(b)(6) Dep. at 243:20-244:7; Bank Dep. at 117:13-118:8, 121:12-16; Leadingham Dep. at 22:2-23:4.]

36.

**GATX Statement No. 36:**

Pursuant to Association of American Railroads Interchange Rule 107, a "depreciated value" or "DV" is calculated in a vacuum based on a variety of standardized inputs such as original cost, empty weight of a car and vintage. The AAR 107 DV does not consider, account for, or measure the condition of specific

railcars. Nor does it calculate a 'fair market value,' residual value, or future revenue stream of a specific railcar. (PX 21: Declaration of David Horwitz ¶¶ 3 -4.)[16]

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 36 are immaterial to GATX's breach of contract claim.  In January 2020, Branford (one of the customers that has leased the Subject Railcars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Railcars.  [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.]  In response, GATX provided the full discounted values for 50 of the Railcars—ranging from $58,222 to $59,010.  [*Id.* at 63:20-64:8, DX 59.]  The "depreciated value" is relevant here, not because of how it is derived, but rather because GATX represented that the "depreciated value" was also the "replacement value" of the Cars after Georgia Power returned them to GATX.  Therefore, the

---

[16] PX 21 was not previously attached to GATX's motion for summary judgment, and is attached hereto.

manner in which a "depreciated value" is calculated and how it is generally used is immaterial to its use in this case.

37.

**GATX Statement No. 37:**

In layman's terms, the DV essentially seeks to calculate an approximate value for what a railcar of a given size and vintage *should* be worth in the abstract assuming that such railcar has been properly serviced and maintained in the absence of intervening events or conditions. (PX 21: Declaration of David Horwitz ¶ 5.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 37 are immaterial to GATX's breach of contract claim.  In January 2020, Branford (one of the customers that has leased the Subject Railcars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Railcars.  [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.]  In response, GATX provided the full discounted values for 50 of the Railcars—ranging from $58,222 to $59,010.  [*Id.* at 63:20-64:8, DX 59.]  The "depreciated value" is relevant here, not because of how it is derived, but rather because GATX represented that the "depreciated value" was also the "replacement value" of the Cars after Georgia Power returned them to GATX.  Therefore, the

45

manner in which a "depreciated value" is calculated and how it is generally used is immaterial to its use in this case.

38.

**GATX Statement No. 38:**

There are different industry uses and applications for the DV, including for insurance purposes. (PX 21: Declaration of David Horwitz ¶ 6.)

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 38 are immaterial to GATX's breach of contract claim.  In January 2020, Branford (one of the customers that has leased the Subject Railcars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Railcars.  [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.]  In response, GATX provided the full discounted values for 50 of the Railcars—ranging from $58,222 to $59,010.  [*Id.* at 63:20-64:8, DX 59.]  The "depreciated value" is relevant here, not because of how it is derived, but rather because GATX represented that the "depreciated value" was also the "replacement value" of the Cars after Georgia Power returned them to GATX.  Therefore, the

manner in which a "depreciated value" is calculated and how it is generally used is immaterial to its use in this case.

39.

**GATX Statement No. 39:**

One use of the AAR 107 DV is as a settlement value for destroyed railcars. More specifically, the DV can be used to establish the liability that is due the owner if a customer/lessee destroys a railcar beyond repair. In effect, the DV calculates what the railcar asset itself should have been worth at the time it was destroyed. (PX 21: Declaration of David Horwitz ¶ 7.)

**Defendant's Response:**

Undisputed, but immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 39 are immaterial to GATX's breach of contract claim.  In January 2020, Branford (one of the customers that has leased the Subject Railcars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Railcars.  [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.]   In response, GATX provided the full discounted values for 50 of the Railcars—ranging from $58,222 to $59,010.  [*Id.* at 63:20-64:8, DX 59.]  The "depreciated value" is relevant here, not because of how it is derived, but rather because GATX represented that the "depreciated value" was

119784082

also the "replacement value" of the Cars after Georgia Power returned them to GATX. Therefore, the manner in which a "depreciated value" is calculated and how it is generally used is immaterial to its use in this case.

40.

**GATX Statement No. 40:**

In this case, the DV is relevant to what the subject Cars *should* have been worth at the time they were returned by Georgia Power. The DV does not, however, calculate the actual value of the Cars in light of the extensive pitting damage or the cost to repair and return the Cars to interchange service. (PX 21: Declaration of David Horwitz ¶ 8.)

**Defendant's Response:**

Disputed.

GATX admitted to third party Branford Steam Railroad ("Branford") that the Cars retained their full discounted value, despite the alleged "pitting damage." In January 2020, Branford (one of the customers that has leased the Cars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Cars. [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.] In response, GATX provided the full discounted values for 50 Cars—ranging from $58,222 to $59,010. [*Id.* at 63:20-64:8, DX 59.]

48

Georgia Power disputes GATX's allegations of "damage" to the Cars. [Lewter 30(b)(6) Dep. at 56:17-21.]  Instead, the condition of the Cars when Georgia Power returned them to GATX was consistent with ordinary wear and tear.  [Viz Dep. at 163:18-164:3; PX 65A at 14-24, 72-74.]

41.

**GATX Statement No. 41:**

Out of the 160 Cars that are at issue, GATX has determined that 137 of the Cars can be repaired (rebodied) and safely returned to interchange service to fulfill the remainder of their service life of 50 years. Thus, the DV is not a measure of GATX's damages for those 137 Cars. (PX 21: Declaration of David Horwitz ¶ 9.)

**Defendant's Response:**

Disputed; unsupported; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 41.  Furthermore, pursuant to L.R. 56.1(B)(2)(a)(2)(ii), and as further set forth in Defendant Georgia Power's Notice of Objection and Motion to Exclude Declaration Testimony ("Notice of Objection") [ECF Nos. 111, 112-1], Georgia Power objects to the admissibility of the material cited in GATX Statement No. 41 for the same reasons Georgia Power objected to the admissibility of similar material in Paragraph 7 of the Declaration of Tyler Dickman (regarding GATX's

119784082

scrapping of 23 Cars), as GATX did not provide that information in its Initial Disclosures or in response to numerous discovery requests.

GATX has not established a "service life" for any of the Cars.  [*See* ███ Dep. at 128:9-129:18, 130:19-25, 132:13-25, 162:23-164:1, DX 150; *id.* at 164:2-165:15, DX 151; *id.* at 169:11-170:14, PX 1; *id.* at 172:18-173:17; Viz Dep. at 106:8-107:19, 207:12-208:21, 340:13-342:1, PX 65A at 44;  Viz Decl., Ex. 1 at 8-10; GATX 30(b)(6) Dep. at 152:24-153:12; ███ Dep. at 71:1-72:14; Bank Dep. at 140:22-143:6.]  GATX has not established how much longer any of the Cars could remain in service without reinforcements, repairs, or rebodying.  [Buzas Dep. at 60:19-62:1, 65:18-66:7; ███ at 161:15-17.]

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

[GATX 30(b)(6) Dep. at 34:9-36:1, DX 47; Dickman Dep. at 31:19-32:15, DX 123; *id.* at 42:10-16; Plaintiff GATX's Objections and Answers to Defendant Georgia Power Company's First Set of Interrogatories ("GATX's Resp. to 1st Interrogs."), No. 7.] ███████████████████████████



[GATX 30(b)(6) Dep. at 87:5-20.]

[*Id.* at 127:20-128:9.]

[*Id.*]

In January 2020, Branford (one of the customers that has leased the Cars since Georgia Power returned them to GATX) requested that GATX provide the "replacement value" of the Cars.  [GATX 30(b)(6) Dep. at 62:7-63:15, DX 58.]  In response, GATX provided the full discounted values for 50 Cars—ranging from $58,222 to $59,010—demonstrating GATX admits the Cars retain a value exceeding $58,000 per Car.  [*Id.* at 63:20-64:8, DX 59.]

42.

**GATX Statement No. 42:**

GATX has determined, however, that the remaining 23 Cars were too extensively damaged to be safely returned to interchange service for the remainder of their full service life. Accordingly, the DV for those Cars (minus GATX's

recovery of any scrap proceeds) is a measure of GATX's damages. (PX 21: Declaration of David Horwitz ¶ 10.)

**Defendant's Response:**

Disputed; unsupported; inadmissible.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 42.  Furthermore, pursuant to L.R. 56.1(B)(2)(a)(2)(ii), and as set forth in Georgia Power's Notice of Objection, Georgia Power objects to the admissibility of the material cited in GATX Statement No. 42 for the same reasons Georgia Power objected to the admissibility of similar material in Paragraph 7 of the Declaration of Tyler Dickman (regarding GATX's scrapping of 23 Cars), as GATX did not provide that information in its Initial Disclosures or in response to numerous discovery requests.

After Georgia Power returned the Cars to GATX, GATX 

[GATX 30(b)(6) Dep. at 34:9-36:1, DX 47; Dickman Dep. at 31:19-32:15, 36:5-21, DX 123 (*see* Cars (1) GACX055847 / GLIX007092, (2) GACX055849 / GLIX007094, (3) GACX055850

/ GLIX007095, (4) GACX0055853 / GLIX007098, (5) GACX055875 / GLIX007120, (6) GACX0055879 / GLIX007124, (7) GACX05580 / GLIX007125, (8) GACX055883 / GLIX007128, (9) GACX05587 / GLIX007132, (10) GACX055895 / GLIX007140, (11) GACX055900 / GLIX007145, and (12) GACX055912 / GLIX007157); *id.* at 42:10-16; GATX's Resp. to 1st Interrogs., No. 7.] ███████████████████████████████

█████████████████████████████████

███████████████████████████████ [GATX 30(b)(6) Dep. at 87:5-20.] ██████████████████████

█████████████████████████████████

███████████ [*Id.* at 127:20-128:9.] ████████████████

█████████████████████████████████

████████████ [*Id.*] GATX previously has characterized all of the Cars as being in similar condition when Georgia Power returned them to GATX. [Bank Dep. at 179:3-22, PX 3 at GATXvGP000056 ("the interiors are basically in the same condition"); ██████████████████████████████.]

GATX has not established a "service life" for any of the Cars. [*See* ████ Dep. at 128:9-129:18, 130:19-25, 132:13-25, 162:23-164:1, DX 150; *id.* at 164:2-165:15, DX 151; *id.* at 169:11-170:14, PX 1; *id.* at 172:18-173:17; Viz Dep. at 106:8-

107:19, 207:12-208:21, 340:13-342:1, PX 65A at 44; Viz Decl., Ex. 1 at 8-10; GATX 30(b)(6) Dep. at 152:24-153:12; ███ Dep. at 71:1-72:14; Bank Dep. at 140:22-143:6.]  GATX has not established how much longer any of the Cars could remain in service without reinforcements, repairs, or rebodying.  [Buzas Dep. at 60:19-62:1, 65:18-66:7; ███ Dep. at 161:15-17.]

43.

**GATX Statement No. 43:**

With its July 26, 2018 letter from Steve Pitts (DX 42), Georgia Power tendered a check to GATX for $115,674.38 for the following amounts:

+ $34,438.00 for non-corrosion repairs to the Supplement No. 2 (Bowen) Cars set forth in a referenced Billing Repair Card ("BRC").

+ $20,330.78 for non-corrosion repairs to the Supplement No. 3 (Wansley) Cars set forth in a referenced BRC.

+ 60,905.60 for stenciling costs.

_____

$115,674.38.

(DX 42: 7/26/2018 Steve Pitts Ltr. to Michael Sullivan at 1 - 2.)

**Defendant's Response:**

Disputed; unsupported.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in GATX Statement No. 43.  The referenced July 26, 2018 letter from Steve Pitts to Michael Sullivan

54

concludes with a clear manifestation that Georgia Power intended the $115,674.38 End-of-Lease Payment to satisfy <u>all</u> of its obligations under the Lease Documents related to the Supplement 2 and Supplement 3 Cars: "With this payment, Lessee has satisfied its end-of-Lease obligations for the Bowen Cars and Wansley Cars and does not owe Lessor anything further under the Lease." [████████] Dep. at 258:1-24, DX 42.]

44.

**GATX Statement No. 44:**

Mr. Pitts' letter states "Lessee's combined payment for the end of lease repair costs for the Bowen Cars and Wansley Cars, as identified in the respective BRCs, and payment for stenciling of the Cars has been remitted." (DX 42: 7/26/2018 Steve Pitts Ltr. to Michael Sullivan at 2).)

**Defendant's Response:**

Undisputed.  The sentence quoted from the referenced July 26, 2018 letter from Steve Pitts to Michael Sullivan is followed by the sentence: "With this payment, Lessee has satisfied its end-of-Lease obligations for the Bowen Cars and Wansley Cars and does not owe Lessor anything further under the Lease." [████

████] Dep. at 258:1-24, DX 42.]

55

119784082

45.

**GATX Statement No. 45:**

Georgia Power's Rule 30(b)(6) representative, Christine Lewter, admitted that

Georgia Power did not believe that GATX was dropping its corrosion claim:

> Q. …And my question is whether Georgia Power actually believed for itself that GATX was releasing or waiving or foregoing its corrosion claim in this case?
>
> A. Georgia Power believed that GATX still wanted to reach a commercial settlement.
>
> Q. Okay. Is that – that a commercial resolution was GATX's preference?
>
> A. That's correct.
>
> Q. And in fact that had been GATX's practice in the past with other corrosion claims involving different cars?
>
> A. That's correct.
>
> …
>
> Q. All right. The first part is what you said a minute ago which is that Georgia Power didn't actually believe that GATX was actually going to drop its corrosion claim, right?
>
> A. Based on our history working with GATX.

(Lewter Dep. at 126:16 – 127:07; 129:03 – 129:09.)

119784082

**Defendant's Response:**

Immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that whether Georgia Power believed GATX was dropping its claim is immaterial to Georgia Power's accord and satisfaction defense as defined by New York law.

46.

**GATX Statement No. 46:**

Steve Pitts, who signed Georgia Power's July 26, 2018 letter, also admitted that Georgia Power knew that GATX had not accepted a satisfaction of its corrosion claim:

> Q.   Practically speaking, there was no confusion about the fact that Georgia Power was denying that it was liable for corrosion, right?
>
> A.   That's correct.
>
> Q.   But practically speaking, was there any confusion at Georgia Power that GATX was maintaining that Georgia Power was liable for the corrosion?
>
> A.   I can only answer for the smaller group [at] Georgia Power that we've been talking about plus any related attorneys, et cetera, but yeah, we were aware of both positions.

(Pitts Dep. at 71:11 – 71:23.)

**Defendant's Response:**

Disputed; unsupported; immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the cited material does not support the facts stated in

GATX Statement No. 46 and, in any event, whether Georgia Power believed GATX was dropping its claim is immaterial to Georgia Power's accord and satisfaction defense as defined by New York law.

The cited testimony makes no reference to GATX's "acceptance" of Georgia Power's July 26, 2018 End-of-Lease Payment to GATX. ███████████████

███████████████████████ [GATX 30(b)(6) Dep. at 258:4-24, DX 42.]

47.

**GATX Statement No. 47:**

In October 2018, GATX initiated this lawsuit by filing a complaint against Georgia Power in the U.S. District Court for the Southern District of New York. (*See* Compl. (Dkt. #1) in *GATX Corporation v. Georgia Power Company*, Case No. 1:18-cv-09758-AJN, pending the U.S. District Court for the Southern District of New York.)

**Defendant's Response:**

Undisputed but immaterial.  Pursuant to L.R. 56.1(B)(2)(a)(2)(iii), Georgia Power states that the facts stated in GATX Statement No. 47 are immaterial to GATX's breach of contract claim or Georgia Power's accord and satisfaction defense as defined by New York law.

Respectfully submitted, this 12th day of October, 2021.

*s/ Thomas E. Reilly*

Thomas E. Reilly, Georgia Bar No. 600195
tom.reilly@troutman.com
Kathleen Campbell, Georgia Bar No. 839699
kathleen.campbell@troutman.com
Thomas Bailey, Georgia Bar No. 194516
matt.bailey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
Bank of America Plaza, Suite 3000
600 Peachtree Street, NE
Atlanta, GA  30308-2216
Telephone:  404.885.3000
Facsimile:   404.885.3900

*Attorneys for Defendant Georgia Power
Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with Local Rule 5.1 and was prepared using a 14-point Times New Roman font.

This 12th day of October, 2021.

*s/ Thomas E. Reilly*

Thomas E. Reilly

119784082

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 12, 2021, I electronically filed the foregoing

**DEFENDANT GEORGIA POWER COMPANY'S RESPONSES TO GATX'S**

**STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO GEORGIA**

**POWER'S MOTION FOR SUMMARY JUDGMENT** with the CM/ECF e-filing

system, which will automatically send email notification of such filing to attorneys

of record.

This 12th day of October, 2021.

*s/ Thomas E. Reilly*
Thomas E. Reilly